# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 23, 2011 Session

## LORI ANN STILES ESTES v. RANDY LEE ESTES

**Appeal from the Circuit Court for Warren County**
**No. 2928     Larry B. Stanley, Jr., Judge**

---

**No. M2010-02554-COA-R3-CV - Filed October 7, 2011**

---

The trial court granted a divorce to the parents of three minor children. The permanent parenting plan incorporated into the decree of divorce designated the mother as the primary residential parent of the parties' twin sons and younger daughter and granted the father standard visitation. The parties lived in Warren County prior to the divorce, in close proximity to the school the children attended. Two years after divorce, Father filed a petition to modify the permanent parenting plan, and Mother moved to another county. The children all testified in chambers that they wanted to spend half the time with their father and to remain enrolled in the Warren County schools. The court concluded that there had been a material change of circumstances and that it was in the best interest of the two boys that their parenting be shared equally between the parties, with custody alternating weekly. The residential plan for the nine year-old girl was left unchanged. Mother argues on appeal that the trial court erred in ruling that there had been a material change of circumstances, and she asks us to restore the previous parenting plan. We affirm the trial court, but modify the judgment to designate Father as the primary residential parent of the parties' sons.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed As Modified**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Eric J. Burch, Manchester, Tennessee, for the appellant, Lori Ann Stiles Estes.

Thomas F. Bloom, Nashville, Tennessee; Tami Ross, McMinnville, Tennessee, for the appellee, Randy Lee Estes.

# OPINION

## I. THE INITIAL PARENTING PLAN

Lori Anne Stiles Estes ("Mother") and Randy Lee Estes ("Father") are the parents of three children. Their twin sons, Zach and Lucas, were born December 29, 1997. Their daughter Taylor was born July 3, 2001. There is very little information in the record as to the circumstances that led to the parties' separation and the dissolution of their marriage. The record nonetheless indicates that Mother filed a complaint for divorce in the Circuit Court of Warren County and that the parties subsequently negotiated the terms of a marital dissolution agreement (MDA) and a permanent parenting plan. Mother was represented by an attorney during those negotiations, while Father acted *pro se.*

On June 6, 2008, the trial court entered a Final Decree of Divorce. The MDA and the permanent parenting plan were incorporated by reference into the final decree. The MDA resolved all the issues of marital property and debt, including the division of the 401(k) retirement accounts that both parties had accumulated as fellow employees at the Bridgestone plant in Warren County, the sale of the marital home, and the division of net proceeds between the parties.

The permanent parenting plan named Mother as the primary residential parent of all three children and set out a residential parenting schedule under which children were to spend 235 days per year with the Mother and 130 days with Father. Father's residential time included every other weekend and every week from Tuesday at 3:30 p.m. to Wednesday at 7:00 a.m., "as well as at other times as agreed by the parties."

All major decisions were to be make jointly by both parties, except for the children's religious upbringing, which was designated as Mother's area of authority. Father was ordered to pay child support of $479.58 bi-weekly, in accordance with the income shares child support guidelines. The following provision was made a part of the plan: "It is understood that Defendant [Father] is currently co-habitating with Yvonnda Roller, however, neither party shall have any other overnight guests of the opposite sex unless related by blood or marriage." Mother testified that she wanted the prohibition against overnight guests to be included in the parenting plan, but that Father would not agree to it unless an exception was made for Ms. Roller.

## II. THE PETITION FOR MODIFICATION OF THE PLAN

On January 20, 2010, Father filed a Petition to Modify the Permanent Parenting Plan and for Contempt. Father claimed that Mother was "in blatant, willful and wanton contempt of this Honorable Court and its Orders by having overnight guests of the opposite sex while the minor children are present." Specifically, he alleged that Mother had allowed Father's co-worker and former close friend, a man named Shane Petty, to spend numerous nights with her, and that he "virtually resides with [Mother] when the minor children are in her care."

Father further alleged that at the time the permanent parenting plan was entered, Mother had told Father that he could have parenting time with the minor children almost any time he wanted. He stated that she had given him additional parenting time in the past, but that after he discussed with her the possibility of modifying the parenting plan, she refused to allow him to have any extra time with the children. Father also stated that he believed that Mother was planning to take the children out of the Warren County School System and to move closer to Murfreesboro, "so she can reside with her boyfriend, who is from Murfreesboro." Father also asserted that the children had told him that they want to live with him if Mother moves away from Warren County.

In her answer, Mother denied that she planned to move and she stated that she "has no intention of removing the children from the Warren County School System." Mother married Shane Petty on March 6, 2010. In May or June of that year, she moved from Warren County to a home she and Mr. Petty had purchased in Coffee County, close enough to Father's home that she was entitled to move there without seeking approval from the trial court or from Father. *See* Tenn. Code Ann. § 36–6–108.

The final hearing on Father's petition was conducted on August 10, 2010, at or near the beginning of the school year in Warren County. Father testified that he took the children to the Warren County Schools office to register them, so they could remain enrolled in the same schools that they had been attending. He also testified that the home he moved into after the marital home was sold was less than ten minutes away from the schools where the children were enrolled. Mother's home had been even closer to those schools.

According to Father's testimony, Mother's new home in Manchester, Coffee County, is 24 miles away from the boys' school. He testified that the normal driving time is 33 minutes each way, and that as a result of Mother's move, the children have to wake up half an hour earlier every day in order to get to school on time. The twins play baseball, and the team will be practicing five days a week from the end of the school day at 3:30 until 5:00. So if Mother picks them up at the end of practice, Taylor will have to wait around to be picked up, and she will not get home until 5:30 or even later.

Father further testified that he has a very loving and open relationship with his children and that he speaks with them on the phone almost every day when they are not in his care. He testified that as the boys have gotten older, he has been sharing more of his interests with them. For example, with Mother's permission he took the boys hunting almost every weekend during deer season in the fall of 2009. He also coached their baseball and football teams. He stated, however, that prior to filing his petition for modification of the parenting plan, he asked Mother to sign a new plan that would allow him more time with the children. She refused and subsequently prevented him from spending any more time with the children than was permitted by the existing parenting plan.[1]

Father acknowledged that he had spent less extra time with Taylor, because she was less interested in hunting and she prefers to stay with Mother much of the time. However, Father's girlfriend Wylonda Roller has a daughter a few years older than Taylor, and Father testified that the two girls had become close friends and that they like to play together in a playroom that he set up in his house.[2]

Father acknowledged under questioning that he did not believe that Mother's relationship with Shane Petty prior to marriage was detrimental to the welfare of the children. But, he asserted that it was important for Mother to comply with the agreement she and the court had signed off on.

When Mother took the stand, she stated that she provided a stable and structured environment for the children and that they were healthy and happy. She affirmed that she thought it was important for Father to have a good relationship with the children, but she did not think the environment he provided was as stable as hers. She was critical of Father because he drinks, he smokes, he chews tobacco and he sometimes curses in the presence of the children. She admitted that she and Shane drink beer on occasion.

Mother testified that she was willing to allow the children to remain enrolled in Warren County schools. She stated that she had contacted someone at the school board, who told her that determining the proper county for the children to register in was "a gray area." She was advised to list on the registration application a Warren County Post Office Box that she had used when she lived in the county, as well Father's current Warren County address.

---

[1]Mother's attorney objected to any testimony to negotiations Father and Mother may have had prior to the filing of his petition to modify the parenting plan. However, the trial court overruled the objection.

[2]Father's girlfriend's first name is spelled Yvonnda in the permanent parenting plan and Wylonda in the hearing transcript. Hereinafter, we will refer to her as Wylonda Roller.

Since Mother, like Father, has to be at work at Bridgestone at 7:00 a.m., she plans to drive the children to a convenience market in Warren County every morning, where her stepmother will meet her, pick the children up and take them to school. She testified that she followed a similar plan the previous year, except that her stepmother would come to her house to pick the children up. When the children are with Father, Wylonda Roller, who apparently works part-time in a doctor's office, usually takes them to school.

Prior to the hearing on the petition, Father had filed a motion in the trial court to allow the children to speak to the judge in chambers about their preferences as to the residential parenting schedule. The court granted the motion and interviewed each of the children separately in his chambers, with the attorneys for the two parties also present and questioning the children. As might be expected, the children were not very talkative and many of their answers were monosyllabic, but they answered all the questions they were asked, and there were no evident discrepancies in their testimony.

The twelve-year old twins both testified that they wanted to spend more time with Father and that they had felt that way for a long time. Zach said that "I just feel like I kind of miss seeing my dad because I hardly ever get to see him anymore." Both boys testified that they like to do "outdoor stuff" like hunting, fishing, floating down the river, and playing baseball and that Father is an outdoor person who is involved in all those activities. They stated that they really enjoyed going hunting with Father the previous Fall. Asked if Mother was also an outdoor person, Zach replied, "She can be, but not really. She's into more girl stuff."

They had no complaints about either parent and said that the rules were about the same in both their households. Both parents made sure they did their homework, that they bathed, and that they got to school on time. Both boys said they like Wylonda and they like Shane. They also like Wylonda's daughter and Shane's children from an earlier marriage. They get along well with their sister, although they admitted that they sometimes fight. Mother's new house is near some woods, and on one occasion, Shane took them hunting.

Both boys testified that they liked Mother's house in Coffee County, but they wanted to stay in school in Warren County. They also explained that before they asked Mother about changing the parenting schedule, they approached Father to see what he thought about dividing their time equally between both parents. Father was positive about it, but did not promise to do anything special for them if it worked out. They asked Mother about making the change three or four times, and she always said no or was unresponsive.

Nine-year old Taylor testified that she also wanted to divide her time equally between her parents, but when she was asked if she would miss her mom if she went seven days

without seeing her, she replied, "kind of." Father had never taken her hunting, but she would be going to a safety class the following weekend, and Father planned to take her hunting afterward. Taylor testified that when she is at Father's house, she spends more time with Wylonda than she does with Father. She enjoys helping Father with his garden and jumping on the trampoline. She also enjoys her gymnastics class.

The trial court took the matter under advisement after hearing all the proof. In an order dated August 16, 2010, the court announced that it had found there to have been a material change of circumstances that required a modification of the parenting plan. The court cited Mother's co-habitation with Mr. Petty,[3] her move out of the county with all the logistical complications it created during the school year, and that "the needs of the parties' minor boys have changed due to their age."

The trial court then found that it was in the best interest of the boys that their residential time be divided equally between Father and Mother, with custody alternating weekly. Mother was to remain the primary residential parent for nine-year old Taylor, with her residential schedule left unchanged, except that Taylor's time with Father was to be adjusted when necessary to coincide with the boys' schedule. A new parenting plan drafted in accordance with the trial court's order allocated each parent 182.5 days of parenting time with the boys, and stated that "[t]he Primary Residential Parent for Lucas and Zach Estes are Randy Estes and Lori Estes. The Primary Residential Parent for Taylor Estes is Lori Estes." Mother appealed the change in the parenting plan.

### III. ANALYSIS

#### A. Was There a Material Change of Circumstances?

A decision on a request for modification of a parenting arrangement requires a two-step analysis. *Cranston v. Combs,* 106 S.W.3d 641, 644 (Tenn. 2003). A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest. *See* Tenn. Code Ann. § 36-6-101(a)(2); *Kendrick v. Shoemake,* 90 S.W.3d 566, 575 (Tenn. 2002). Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. *Kendrick v. Shoemake,* 90 S.W.3d at 569; *Blair v. Badenhope,* 77 S.W.3d 137, 150 (Tenn. 2002); *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006).

---

[3]The court stated that it found Mother to be in civil contempt for co-habitating with Shane Petty prior to marriage. "However, there shall be no punishment since she has married Mr. Petty."

The question of whether a material change of circumstances has occurred is a question of fact. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007); *Murray v. Murray*, M2009-01576-COA-R3-CV, 2010 WL 3852218 (Tenn. Ct. App. Sept. 28, 2010) (no Tenn. R. App. P. 11 application filed). Our review of findings of fact in child custody or parenting plan cases is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). Questions of law are reviewed *de novo* with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston*, 854 S.W.3d 87, 91 (Tenn. 1993).

The Tennessee Supreme Court has set out some principles for the court to consider when a material change of circumstances is at issue:

> Although there are no bright line rules as to whether a material change in circumstances has occurred after the initial custody determination, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston v. Combs,* 106 S.W.3d at 644 (citing *Kendrick v. Shoemake*, 90 S.W.3d at 570).

It is plain that the changes cited by the trial court all occurred after the entry of the order sought to be modified. Further, there are no indications in the record that at the time of the final decree of divorce the parties knew or anticipated those changes.

Mother's primary argument on appeal is that the trial court applied too lenient a standard to the question of whether a material change of circumstances had occurred. Her argument is based on two similar enactments by our legislature that are meant to assist the courts to understand what constitutes a material change of circumstances in cases where a party wishes to modify a prior decree. By its terms, Tenn. Code Ann. § 36-6-101(a)(2)(B) applies if the issue before the court is "a modification of the court's prior decree pertaining to custody,"[4] while Tenn. Code Ann. § 36-6-101(a)(2)(C) applies if the issue before the court

---

[4]Prior to a 2004 amendment, the first sentence of Tenn. Code Ann. § 36-6-101(a)(2)(B) read: "If the issue before the court is a modification of the court's prior decree pertaining to custody or a residential parenting arrangement, the petitioner must prove by a preponderance of the evidence a material change in

(continued...)

is "a modification of the court's prior decree pertaining to a residential parenting schedule."

Tenn. Code Ann. § 36-6-101(a)(2)(B) reads,

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(C) reads,

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.[5]

---

[4](...continued)
circumstance." The 2004 amendment deleted the language "a residential parenting arrangement" from that sentence and added subsection (C) to the statute. As a practical matter, our courts equate the term "custody" to the designation of a "primary residential parent" because the two terms have the same meaning within the context of proceedings like the one before us. *See Scofield v. Scofield*, M2006-00350-COA-R3CV, 2007 WL 624351 (Tenn. Ct. App. Feb. 28, 2007)(no Tenn. R. App. P. 11 application filed).

[5]We note that the "best interest" language of both sections somewhat conflates a material change of circumstances with the separate requirement of a finding of best interest for a modification of custody or of a parenting plan. But it appears to us that the language is meant to prevent modifications based on minor or transient changes that do not really affect the best interest of the child or children involved.

Although the two subsections do not differ greatly in their substance, this court has interpreted the statute to mean that in order to designate a different custodian for the children under subsection (B), the trial court must find that a more substantial change of circumstances has occurred than has to have occurred under subsection (C) to justify a less drastic change in a parenting plan, such as a change in the residential parenting or visitation schedule. *See In re T.C.D.*, 261 S.W.3d 734, 744 (Tenn. Ct. App. 2007) (citing *Rose v. Lashlee*, M2005-00361-COA-R3-CV, 2006 WL 2390980, at \*2, n. 3 (Tenn. Ct. App. Aug. 18, 2006) (no Tenn. R. App. P. 11 application filed) (holding that subsection (C) "sets a very low threshold for establishing a material change of circumstances."); *Scofield v. Scofield*, M2006-00350-COA-R3CV, 2007 WL 624351 at \*3 (Tenn. Ct. App. Feb. 28, 2007) (no Tenn. R. App. P. 11 application filed).

Mother argues that we should apply the more stringent standard of subsection (B) to this case because, in her view, the modification ordered by the trial court amounted to a change of custody. In support of her argument, she cites the recent case of *Richards v. Richards,* E2010-00521-COA-R3-CV, 2011 WL 2135432 (Tenn. Ct. App. May 31, 2011)(no Tenn. R. App. P. 11 application filed). In that case, the parties lived near each other after divorce, and they agreed to divide parenting time with their school-aged child equally. The father subsequently moved about fifty miles away, rendering the equal division of parenting time no longer workable.

The mother filed a petition for modification of the parenting plan, which resulted in the trial court designating her as the child's primary residential parent. This court affirmed the trial court, stating that it was applying the standard of Tenn. Code Ann. § 36-6-101(a)(2)(B) to determine whether a material change of circumstance had occurred. In the case before us, Mother suggests that if a change from an equal parenting schedule to one in which one parent becomes the primary residential parent warrants analysis under subsection (a)(2)(B), the same kind of analysis should apply to a change from a parenting plan that designates one primary residential parent to a plan that sets out an equal parenting schedule.

In another recent case, however, this court applied subsection (a)(2)(C) to affirm a change of schedule from one in which the father served as the primary residential parent to one in which the parents shared parenting time equally. *Schreur v. Garner,* M2010-00369-COA-R3-CV, 2011 WL 2464180 (Tenn. Ct. App. June 20, 2011)(no Tenn. R. App. P. 11 application filed). The inconsistency between the two cases is perhaps due to the fact that a change to or from an equal parenting schedule falls somewhere in between a minor schedule adjustment and a change of custody from one parent to another.

In the case before us, however, the distinction between the two subsections is not determinative. The evidence supports the finding of a material change of circumstances under either subsection.

The trial court herein carefully questioned each of the children and allowed the attorneys for both parties to question them as well. The court was able to observe the children's demeanor, to gauge their sincerity, and to satisfy itself that they were not speaking at the behest of either parent, but rather out of an understanding of their own preferences and needs. The evidence showed that the twin boys had reached an age when they could benefit from being able to spend more time with Father, with whom they shared an interest in sports and outdoor activities. Also, Mother's move to another county created some problems and difficulties that could be lessened by equalizing the parenting time between both parents. The children's ability to stay in Warren County schools was jeopardized by the primary residential parent's move out of county.

In sum, the proof demonstrated that after Mother moved away from Warren County the existing parenting plan was no longer in the best interest of the older children in light of their changing needs, thus meeting the threshold requirement of a material change of circumstances under either Tenn. Code Ann. § 36-6-101(a)(2)(B) or (C). The parties did not separately brief the question as to whether the change in the residential schedule ordered by the trial court was in the children's best interest, so we need not discuss it in this opinion. *See* Tenn. R. App. P. 36.

**B. The Designation of a Primary Residential Parent.**

We have discovered a flaw in the parenting plan that must be corrected. Tenn. Code Ann. § 36-6-404(a) requires that a permanent parenting plan be incorporated into any final decree in an action for absolute divorce involving a minor child. Tenn. Code Ann. § 36-6-402(3) defines a parenting plan as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a Residential Schedule."

Tenn. Code Ann. § 36-4-402(5) declares that the residential schedule must include the designation of a primary residential parent. Tenn. Code Ann. § 36-6-402(4) defines the primary residential parent as "the parent with whom the child resides more than fifty percent (50%) of the time." Obviously, if the children are dividing their time equally between both parents, neither parent meets the statutory definition of a primary residential parent.

-10-

Nonetheless, Tenn. Code Ann. § 36-6-410 declares that the designation of a primary custodian is necessary for all state and federal statutes and applicable policies of insurance which require a determination of custody. Thus, ". . . even though there may be no primary residential parent in fact, the law requires the designation of one parent as the primary residential parent, regardless of the statutory definition." *Cummings v. Cummings*, M2003-00086-COA-R3-CV, 2004 WL 2346000 (Tenn. Ct. App. Oct. 15, 2004) (no Tenn. R. App. P. 11 application filed). *See, also, Hopkins v. Hopkins,* 152 S.W.3d 447, 450 (Tenn. 2004); *Coley v. Coley,* M2007-00655-COA-R3-CV, 2008 WL 5206297 (Tenn. Ct. App. Dec. 12, 2008) (no Tenn. R. App. P. 11 application filed).

The trial court in the present case named both Mother and Father as the primary residential parent for the twins. The trial court's action does not comply with the requirement that **one** parent be named as the primary residential parent. The trial court must designate that role to only one of the parents, but such designation does not affect or alter other provisions of the parenting plan, specifically, the equal division of parenting time. Because both parents agree that the boys should continue to go to school in Warren County, and because naming Mother as their primary residential parent could affect their ability to remain enrolled in that county, we direct the trial court on remand to name Father as the primary residential parent of the two boys. We accordingly affirm the trial court's decision, with the modification of naming father as the primary residential parent of Zach and Lucas.

## C. Attorney Fees on Appeal

Father has asked this court to award him the attorney fees he incurred on appeal. Tenn. Code Ann. § 36-5-103(c) gives the court the discretion to award attorney fees to the prevailing party, ". . . in regard to any suit or action concerning the adjudication of custody or the change of custody of any child, or children of the parties . . ." *See* also, *Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008); *Shofner v. Stewart*, 232 S.W.3d 36, 41 (Tenn. Ct. App. 2007). Such an award is especially appropriate when the prevailing party lacks the income or the resources needed to pay such fees, and when payment of the obligation is likely to have a negative effect on the living standard of the children. *See Ragan v. Ragan*, 858 S.W.2d 332, 333 (Tenn. Ct. App. 1993).

That is not the case here. The completed forms in the record for the calculation of child support under the income shares guidelines show that Father and Mother both enjoy comfortable incomes, and there is no suggestion in the record that either of them would be unable to pay their own attorney fees on appeal. Consequently, we decline to make an award of attorneys' fees.

**IV.**

We affirm the order of the trial court, as modified.  Remand this case to the Circuit Court of Warren County for any further proceedings necessary.  Tax the costs on appeal to the appellant, Lori Ann Stiles Estes.

_____
PATRICIA J. COTTRELL, JUDGE